**GARSON, SÉGAL, STEINMETZ, FLADGATE LLP**
Robert Garson (RG-1521)
Kevin Kehrli (KK-1536)
164 West 25th Street, 11th Floor
New York, New York 10001
Telephone: (212) 380-3623
Facsimile: (347) 537-4540
Email:  rg@gs2law.com
            kk@gs2law.com
*Attorneys for Plaintiff George Gervin*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEORGE GERVIN<br><br>                                        Plaintiff,<br>v.<br><br>RALPH LAUREN CORPORATION<br><br>                                        Defendant. | Civil Action No.:  1:23-cv-1284 (     )<br><br>**Complaint with Demand for Jury Trial** |

Plaintiff, George Gervin (hereinafter "Plaintiff"), by and through his attorney of record, allege upon knowledge as to himself and his own actions and allege upon information and belief as to all other matters as follows:

**Introductory Statement**

1. This action arises from the willful exploitation of, and false association with, the name and likeness of Plaintiff George Gervin, without his consent, authorization, or compensation.

2. Firmly ensconced in the pantheon of basketball greats, Mr. Gervin, a member of the Naismith Memorial Basketball Hall of Fame and pioneer of the game, is widely credited with a number of scoring records (only Wilt Chamberlain and Michael Jordan have won more league scoring titles than Mr. Gervin's four), trends, and accolades, including his signature finger roll, and leading the way during the emergence of the high-top basketball sneaker, both of which are now commonplace in the sport.

3. Mr. Gervin's storied American Basketball Association (ABA) and National Basketball Association (NBA) playing career paved the way for the athletes we see today; all while playing during an era (1970's) in the United States of heightened racial tension and segregation despite advancements in civil rights.

4. Despite such obstacles, Mr. Gervin managed to surpass his peers and become a role model to many.

5. As such, Mr. Gervin is the subject of a documentary about his life and basketball career scheduled to be released this year.

6. Mr. Gervin is still very active in the sport, and last summer coached a team in the BIG3 3-on-3 basketball tournament that toured through Chicago, Dallas, Tampa and Atlanta and was televised and/or streamed on CBS Sports and the Paramount+ platform.

7. In addition, Mr. Gervin passionately serves non-profit causes such as his George Gervin Youth Center, which was created to provide services to troubled youth and their families, and the George Gervin Preparatory Academy, a charter school that serves approximately 250 kindergarten through eighth grade students in south Phoenix.

8. Mr. Gervin has been passionate about educating and raising awareness among younger athletes about the importance of protecting their privacy, personal information, names, likenesses, data, and other aspects of their identities for some time.

9. As is his right, Mr. Gervin fiercely protects his name, image, likeness, and persona.

10. Recently, Mr. Gervin was introduced as a brand ambassador for IPrivata, LLC, a US-based company whose platform and technology is designed to manage and help people take control of their digital identities and assets; enabling athletes/sports figures to manage and control their personal data and digital rights.

11. Despite publicly advocating for racial equality through its public relations arm,[1] Defendant Ralph Lauren, surreptitiously released a line of retro-styles 1970's high-top basketball sneakers called the "Gervin Mid" seeking to profit off the back of Mr. Gervin's commercially valuable identity, without once seeking his consent or authorization to use Mr. Gervin's name or likeness or offer to compensate him for the use of his valuable name.

12. Not content with an annual revenue of Six Billion Dollars, Ralph Lauren Corporation ("Ralph Lauren") clearly sought to trample on the right of publicity of a retired and aging athlete, under the mistaken belief that he may have died or was/is incapable of asserting his rights.

13. Neither is the case.

14. Ralph Lauren has willfully and without authorization used Mr. Gervin's name, likeness, and persona for commercial purposes, subverting Mr. Gervin's exclusive

---

[1] *Taking Action on Racial Equality*, ralphlauren.com. Accessible at: Ralphlauren.com/solidarity

3

ownership right to control the licensing of his name, image, likeness, and persona in the commercial marketplace.

15. For Ralph Lauren to deprive Mr. Gervin of the ability to choose which business, products, or causes could benefit most from use of his name, and to falsely associate itself with him, in order to profit from the unauthorized use of such a groundbreaking individual's name, flies in the face of what Ralph Lauren purports to be its "values like authenticity, dignity, and respect for one another."

16. Ralph Lauren's unauthorized uses constitute false and/or misleading representations of fact to falsely imply the endorsement of defendant's business and products by Mr. Gervin.

17. For the following reasons, Mr. Gervin seeks to hold Ralph Lauren accountable and liable for willfully and intentionally devising this scheme to profit illegally off his name.

**Jurisdiction and Venue**

18. The Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). This is a civil action arising under federal law, the Lanham Act of 1946 as amended (codified at 15 U.S.C. §§ 1051, *et seq*.). The pendent state law claims are so related to the federal claims that they form part of the same case or controversy pursuant to Article III of the United States Constitution. The Court therefore has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a).

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) for several independent reasons, including: Defendant's principal place of business is in this

judicial district for venue purposes under 28 U.S.C. § 1391(c)(2); a substantial part of the events or omissions giving rise to the claims occurred in this district.

## The Parties

20. Plaintiff George Gervin is an internationally recognized sportsman with his place of residence in San Antonio, Texas.

21. Defendant is a Corporation with its ~~of~~ business headquarters located at 650 Madison Avenue New York, NY 10022.

## Statement of Facts

### Gervin's Career, Fame, Image, and Name

22. A 12-time (straight!) ABA or NBA All-Star, George Gervin is recognized as a true superstar of pro basketball.

23. Gervin started his career in the American Basketball association with the ABA's Virginia Squires in 1973 before moving to the NBA's San Antonio Spurs in 1974, where he was named an All-Star nine times before moving to the Chicago Bulls, where he played one season along-side then rising star, Michael Jordan.

24. When Gervin was traded from San Antonio to Chicago, he held almost every scoring record in the Spurs' history; and he retired from the NBA with the most scoring titles (4) of any guard/small forward in NBA history until that record was overtaken by Michael Jordan himself.

25. Gervin's cool demeanor, and even cooler signature delicate finger roll earned him the nickname "The Iceman," which he embodied on and off the court.

5

26. Despite his unimpeachable achievements, athletes of Gervin's era did not earn the jaw-dropping salaries paid to professional athletes today and retirement came with difficult financial decisions and the need for keen fiscal responsibility.

27. Nonetheless, following his retirement, Gervin turned his focus to using his name and resources to benefit his beloved San Antonio community, focusing on child welfare and development.

28. In 1991, Gervin established the George Gervin Youth Center ("GGYC") which provides various services to troubled youths and their families.

29. In conjunction with the GGYC, Gervin established the George Gervin Academy, George Gervin Technology Center, and the George Gervin Preparatory Academy, which form a tuition-free public charter school system geared toward serving as a community resource and an alternative educational pathway for at-risk students.

30. In 1996, Gervin was named as one of the 50 greatest players in NBA history, to the NBA's 50th Anniversary All-Time Team, and was inducted into the Naismith Memorial Basketball Hall of Fame.

31. In recent years, while remaining active and passionate about his local San Antonio community, Mr. Gervin has sought to use his fame and name recognition to advocate for a new generation of athletes facing a variation of image and likeness threats – namely, the threat to their digital identities.

32. It is not uncommon for young athletes, even as young as high-school aged, to face decisions related to their images and likenesses that could have financial repercussions for the rest of their lives.

33. It is not surprising, then, that exploitative and unprincipled actors often seek to profit from these developing athletes.

34. As such, Mr. Gervin has recently partnered with IPrivata and the HBAR Foundation to launch the "I Own Me" campaign to raise awareness for and educate athletes on how to protect their image and likenesses in the modern digital and virtual landscape.

<u>Ralph Lauren's Hypocrisy and the Release of the Gervin Mid</u>

35. In the wake of the numerous tragic and racially charged incidents plaguing our country, it has become a trend for large corporations to plant their flags as advocates for racial equality; but words are just PR without accompanying action.

36. Ralph Lauren's words are nice – the company has vowed to "deeply examine bias," to look "critically at the structures and practices inside [its] company," and to "create environments that reflect the values that define [its] brand – values like authenticity, dignity, and respect for one another."

37. On May 26, 2021, a year after the death of George Floyd, Mr. Ralph Lauren himself wrote (or at least, signed) and published the following statement:

> At this time last year, our company joined our nation and the world in a long overdue reckoning with racism. We examined the ingrained biases, the apathy that accompanies privilege, and the systems that were built to suppress people of color – particularly for our Black, African, and African American colleagues and communities.

38. Again, nice words, but they ring hollow when viewing the company's actions.

39. Just over a year after Mr. Lauren's report on the company's "examination" on racism, Defendant released the "Gervin Mid" line of sneakers without even contacting George Gervin, whose style and career inspired the very same.

7

40. "Ingrained bias, the apathy that accompanies privilege, and the systems that were built to suppress people of color."

41. "Environments that reflect the values that define [the Ralph Lauren} brand . . . like authenticity, dignity, and respect for one another."

42. Ingrained bias could rear its head in the idea that this individual won't mind or won't defend himself.

43. Apathy that accompanies privilege could appear in the form of not even thinking to check with an individual before exploiting his name and fame.

44. Suppressing people of color is embodied by taking their rights away, including their right to use their name.

45. Authenticity is not falsely associating your brand with a famous individual without consent.

46. Dignity is not exploiting another's name for profit.

47. Respect for one another would dictate obtaining consent and sharing in the profits of the use of Mr. Gervin's name.

48. There can be no mistake that this association with Mr. Gervin's name and likeness was intentional, advertised as having "a cool old school-inspired look" with a "retro-inspired silhouette."

49. In 1973, as Nike was still in its nascent stages as a company, the company released what would become one of the most iconic sneakers in history, called "The Blazer."

50. In what would become common practice in the industry, to market the shoe and solidify Nike's relationship with professional basketball, Nike entered into a strategic

8

partnership with Mr. Gervin, who became the first to debut the Blazer model in an NBA game.



(Mr. Gervin in his iconic Nike Blazers – Licensed from Getty Images)

51. Nike provided Mr. Gervin with what is often considered the first Player Exclusive model sneaker, replacing the "Nike" brand across the back of the Blazer with "ICEMAN," Mr. Gervin's nickname.

9



(Nike's Player Exclusive ICEMAN Blazer's Game Worn by Mr. Gervin – as shown in *"George Gervin Explains Evolution of Nike Blazer"* by Nice Kicks available at https://www.youtube.com/watch?v=0HbQh8a7Sls)

52. After 50 years, Nike still utilizes the timeless vintage silhouette of the Blazer, and those with knowledge of NBA or Nike history forever associate this shoe with Mr. Gervin.

53. Indeed, ICEMAN Blazers that are game-used or signed by Mr. Gervin have been sold as collectibles at auction to sneaker collectors for prices in excess of $1,000.00 per pair.

54. It is no wonder, then, that Ralph Lauren would seek to exploit Mr. Gervin's fame and generate interest in its own model evocative of the Blazer by attempting to pass off an affiliation with Mr. Gervin.

55. The likenesses between the Nike Blazers worn by Gervin during his career (shown above), Nike's Blazer Mid '77 Vintage inspired by those worn by Gervin (Below, left), and Ralph Lauren's Gervin Mid (Below, right) are obvious.

**Nike's Blazer Mid '77 Vintage**                **Ralph Lauren's Gervin Mid**

    

56. There can be no doubt, therefore, given the unique history of Mr. Gervin's association with the high-top shoe and the Nike's Blazer's popularity, that Ralph Lauren was exploiting Mr. Gervin's unique and commercially valuable identity, name, and likeness to sell its products.

<u>Ralph Lauren Changes the Name of the Shoe but Refuses to Remunerate Mr. Gervin for the Damage Already Done</u>

57. On April 14, 2022, Mr. Gervin's wife received a text message from a friend congratulating them on the fact that "Ralph Lauren named a shoe after George Gervin."

58. Shocked, because Mr. Gervin was under no contractual agreement and never had any association or communication with Ralph Lauren, Mr. Gervin's counsel, Michael Clohisy, contacted Ralph Lauren on June 11, 2022 demanding that Ralph Lauren: a.

immediately cease and desist from using, publishing, distributing, selling, licensing or otherwise exploiting Mr. Gervin's name and/or likeness; and b. provide a detailed accounting of any and all monies that Ralph Lauren and its affiliated websites received from the use and exploitation of his name.

59. In the following weeks, a number of phone calls took place between Mr. Clohisy and Ralph Lauren's in-house legal counsel, Ms. Alice Pang, in which a number of excuses were proffered for ~~this~~ Ralph Lauren's shameless and intentional use of Mr. Gervin's name, including the fantastical story that one of Ralph Lauren's French-based designers "coincidentally" named the shoe the Gervin because it "sounded good," claiming no knowledge that the unique Gervin name was also the name of a superstar NBA basketball player who played in the 1970's while wearing a near-identical Nike basketball shoe called The Blazer.

60. Ultimately, Ralph Lauren refused to take responsibility for this intentional exploitation, brought in outside counsel, and have left Mr. Gervin with no choice but to seek the Court's intervention in this matter.

61. While Ralph Lauren ultimately changed the name of its line of sneaker (in part), due to the pervasive and permanent nature of the internet, the digital footprint damage was already been done and the Ralph Lauren Mid is forever algorithmically linked to Gervin's name.

62. Also, as of the date of this filing, secondary sellers continue to sell the Gervin Mid, reviews continue to liken the shoe to Mr. Gervin, and, shockingly, Ralph Lauren has defied the original cease and desist sent in May 2022 by Mr. Gervin's attorney Michael

Clohisy and, as of the date of this filing, is once again selling baby shoes[2] globally on its e-commerce website using Mr. Gervin's name:



63.     Accordingly, Ralph Lauren willfully and knowingly exploited and continues to exploit Mr. Gervin's name with an utter disregard for Mr. Gervin's rights, and Mr. Gervin is entitled to damages, disgorgement, profits and any equitable relief.

**First Claim for Relief**
(N.Y. Civ. Rights L. §50-51)

64.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set forth herein.

---

[2] https://www.ralphlauren.com/baby-boy-footwear-shoes/gervin-mid-faux-leather-ps-sneaker/632611.html (last accessed February 13, 2023 at 12:34 pm EST.

65. Defendant has willfully and without authorization used Mr. Gervin's name, image, likeness, and persona for commercial purposes, to advertise shoe products, which are manufactured, distributed and/or sold by Defendant and its subsidiaries.

66. Defendant used Mr. Gervin's name for advertising purposes across the country, including in New York.

67. Defendant's use of Mr. Gervin's name was used solely to generate profit from shoe sales, and not for purposes of free dissemination of thoughts, ideas, newsworthy events, or matters of public interest.

68. Such use is a violation New York Civ. Rights Law Sections 50 and 51.

69. Defendant knowingly used such Mr. Gervin's name in such manner as is forbidden or declared to be unlawful by N.Y. Civ. Rights L. §50.

70. As a direct and proximate result of Defendant's knowing and wrongful use of his name, Mr. Gervin has suffered, and will continue to suffer, damages in an amount to be proven at trial, but not less than two million dollars ($2,000,000.00).

71. Further, as Defendant acted knowingly, Mr. Gervin is entitled to exemplary damages and injunctive relief.

## Second Claim for Relief
(False Endorsement (15 U.S.C. § 1125(a)))

72. Plaintiff re-alleges and incorporates by reference paragraphs as if fully set forth herein.

73. Mr. Gervin is the owner of all statutory and common law rights associated with his name, image, likeness, and persona necessary for endorsement deals, including Mr.

Gervin's right to decide whether to associate his name, image, likeness, or persona with any third party for purposes relating to sponsorship and/or endorsement

74. Defendant used distinctive attributes of Mr. Gervin's persona, including his name, image, and likeness without permission by using his name in association with its Gervin Mid line of sneakers.

75. Defendant's unauthorized uses constitute false or misleading representations of fact to falsely imply the endorsement of Defendant's business and products by Mr. Gervin.

76. Defendant's unauthorized use of Mr. Gervin's name and persona is likely to confuse and deceive consumers as to Mr. Gervin's sponsorship and/or endorsement of Defendant's sneakers.

77. Specifically, Defendant's use of Mr. Gervin's name, image, and likeness is likely to cause consumers to mistakenly believe that Mr. Gervin is associated with Defendant's sneakers, or that he sponsors or endorses Defendant's products.

78. As a direct and proximate result of the acts of false endorsement set forth above, Mr. Gervin has suffered actual damages in an amount to be proven at trial, but not less than two million dollars ($2,000,000.00).

79. Mr. Gervin is entitled to the full range of relief available under the Lanham Act, 15 U.S.C. § 1117, including, without limitation, an award of actual damages and the disgorgement of Defendant' profits arising from their false or misleading acts.

80. Defendant' conduct further renders this an "exceptional" case within the meaning of the Lanham Act, thus entitling Gervin to an award of attorneys' fees and costs.

81. Defendant committed the unauthorized acts described above knowing that they are likely to cause consumers to falsely believe that Mr. Gervin endorses Defendant's brands and products.

**Third Claim for Relief**
(Common Law Trademark Infringement)

82. Plaintiff re-alleges and incorporates by reference paragraphs as if fully set forth herein.

83. Mr. Gervin owns a valid common law trademarks in GERVIN for use in connection with the promotion of products and services in the sportwear industry.

84. The public has come to recognize the GERVIN mark as exclusively identifying Mr. Gervin, and the mark is famous worldwide.

85. Defendant have infringed Mr. Gervin's trademark by using the mark in connection with its sneakers to promote Defendant's brands and sale of sneaker products.

86. Defendant's unauthorized use of Mr. Gervin's trademark is likely to confuse and deceive consumers as to the origin, sponsorship, and/or endorsement of Defendant's brands and products.

87. Specifically, Defendant's use of Mr. Gervin's mark is likely to cause consumers to mistakenly believe that Mr. Gervin is associated with Defendant and/or that he sponsors or endorses Defendant's products.

88. As a direct and proximate result of the acts of trademark infringement set forth above, Gervin has suffered actual damages in an amount to be proven at trial, but not less than two million dollars ($2,000,000.00).

89. Defendant acted with fraud, oppression, or malice in infringing Mr. Gervin's mark as alleged above.

90. As such, in addition to the other relief sought herein, Mr. Gervin is entitled to an award of punitive damages.

**JURY TRIAL DEMANDED**

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against Defendant for:

a. A permanent injunction enjoining Defendant and their agents, servants, and employees from profiting from Plaintiff's name or infringing in any manner on Plaintiff's trademarks and from copying, disseminating, altering or otherwise disposing of any copies thereof following a final decision in this action;

b. An accounting for payment to Plaintiff of all gains, profits and advantages derived by Defendant as a result of their infringement of Plaintiff's rights;

c. The delivery by Defendant, its agents, employees and all others for whom Defendant is responsible, or anyone acting on their behalf, of all articles alleged to infringe the right of Plaintiff;

d. Delivery by Defendant, their agents, employees and all others for whom Defendant are responsible or anyone on their behalf, all infringing products including all infringing designs and other means for making infringing copies;

e.  Delivery by Defendant, their agents, employees and all others for whom Defendant are responsible or anyone on their behalf, all records documenting the manufacture, sale, or receipt of things involved in any such violation, provided that any records seized shall be taken into the custody of the Court;

f.  An award of damages in an amount to be determined at trial not less than two million dollars ($2,000,000.00), including those authorized by 15 U.S.C. §1117;

g.  Exemplary damages as permitted by N.Y. Civ. Rights L. §51;

h.  Plaintiff's costs and attorneys' fees incurred; and

i.  Any such other relief as this Court deems just.

Dated:  New York, New York
        February 15, 2023

GARSON, SÉGAL, STEINMETZ, FLADGATE LLP

By:  /s/ RDMG
Robert Garson (RG-1521)
Kevin Kehrli (KK-1536)
164 West 25th Street, Suite 11R
New York, NY 10001
Tel: (212) 380-3623
Fax: (347) 537-4540
Email: rg@gs2law.com
       kk@gs2law.com

*Attorneys for Plaintiff George Gervin*